[Cite as *State v. Durham*, 2020-Ohio-4758.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | : | JUDGES: |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff - Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | |
| WILLIAM E. DURHAM, JR., | : | Case No. 19 CAA 10 0057 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:       Appeal from the Delaware County
                               Court of Common Pleas, Case No.
                               19 CRI 02 0149

JUDGMENT:                      Affirmed

DATE OF JUDGMENT:              September 30, 2020

APPEARANCES:

For Plaintiff-Appellee

MELISSA A. SCHIFFEL
Delaware County Prosecutor

By: JOEL C. WALKER
Assistant Prosecuting Attorney
145 N. Union Street, 3rd Floor
Delaware, Ohio 43015

For Defendant-Appellant

EVAN N. WAGNER
Furniss Stewart & Wagner, LLC
3970 Brown Park Dr., Suite B
Hilliard, Ohio 43026

*Baldwin, J.*

{¶1}   Appellant, William E. Durham, Jr. appeals the decision of the Delaware County Court of Common Pleas convicting him of (1) engaging in a pattern of corrupt activity, in violation of R.C. 2923.32(A)(l), a felony of the first degree; (2) telecommunications fraud, in violation of R.C. 2913.05(A), a felony of the third degree; (3) theft, in violation of R.C. 2913.02(A)(3), a felony of the fourth degree; (4) tampering with records, in violation of R.C. 2913.42(A)(2), a felony of the third degree; (5) identity fraud, in violation of R.C. 2913.49(B)(l), a felony of the third degree; (6) forgery, in violation of R.C. 2913.31(A)(3), a felony of the fourth degree and sentencing him to an aggregate term of imprisonment of nine years. Appellee is the State of Ohio.

## STATEMENT OF FACTS AND THE CASE

{¶2}   Briana Taylor and William McClanahan conspired with a person known to them as Willie Maxx to make fraudulent withdrawals from bank accounts at PNC Bank in Westerville, Ohio and other PNC branches in Ohio and Florida. PNC discovered the fraudulent access and confronted Briana Taylor, their employee, and she confessed her role to the Westerville Police Department and implicated Willie Maxx. The Westerville Police Department interviewed William McClanahan who also admitted his part in the plan and he mentioned Willie Maxx as one of the persons involved in the scheme to defraud PNC. Detective Ted Smith discovered information that led him to conclude that Willie Maxx was an alias for appellant, William E. Durham, Jr.. Durham was arrested, charged with seven different counts arising from the scheme, and convicted after a three-day jury trial.

**{¶3}** Durham and Taylor knew each other from high school and kept in touch through texts and social media. Taylor knew Durham as Willie Maxx, an alias he adopted for reasons not explored in the record. Over the course of several conversations, Durham learned that Taylor worked as a teller at PNC Bank in Westerville, Ohio, that she was a single mother, and that she had serious financial difficulties. She was the only employed person in her extended family and they were on the verge of being evicted from their home.

**{¶4}** During one of their conversations, Durham suggested a solution to Taylor's financial plight. If she could access account information, Durham could arrange for the creation of counterfeit identification, and, with the help of another person, they could successfully withdraw funds from large accounts at PNC and share the proceeds. Taylor agreed to participate and provided account information by bringing it up on her computer screen while at work and photographing the screen with her cell phone. She sent the information via text message to Durham, who used the personal identifying information to create a false identification for the third party involved, William McClanahan.

**{¶5}** Durham recruited McClanahan, his cousin, to make the fraudulent withdrawals from PNC. After identifying an account with sufficient funds, he planned to provide McClanahan with a withdrawal slip and drive him to a PNC branch. McClanahan would enter the bank, hand the withdrawal slip and the phony identification to the teller, and leave with the cash.

**{¶6}** Durham wanted to withdraw large amounts, as much as $40,0000.00, but Taylor warned him that any withdrawal over $10,000.00 would require the completion of a Cash Transaction Report and would draw additional scrutiny, increasing the likelihood

their fraud would be discovered  Further, the bank where she worked as a teller did not have that much cash on hand, making it impossible to withdraw such a large amount.

{¶7}   Durham had also wanted to complete the transaction at a drive-through station to lesson McClanahan's exposure to cameras and witnesses.  Taylor warned him that withdrawals at drive-through teller stations were limited to $1000.00.

{¶8}   Once they agreed on the details and had selected a well-funded account, the three planned their first withdrawal for the bank at which Taylor served as a teller. Durham obtained the false credentials and gave them to McClanahan.  McClanahan was instructed to enter the bank and go to the only female teller in the bank.  He had not met Taylor, so Durham showed him a picture so he would know who to approach. McClanahan planned to withdraw $9,850.00 from the selected account and meet with Durham after the withdrawal was complete.  Each party expected to receive a share of the cash, but the amount to be shared was controlled by Durham.

{¶9}   On July 6, 2017, their first attempt to withdraw funds was successful. McClanahan entered the bank and, as planned, went directly to Taylor's station and handed her the withdrawal slip. Taylor immediately noticed a problem with the account number, but was reluctant to retrieve the number from her computer terminal for fear that she would be discovered.  Instead, she sent Durham a text requesting the information and he responded.  She processed the transaction,  gave McClanahan the cash and he left the bank.  McClanahan met with Durham a short distance from the bank and handed over the money.  Durham paid McClanahan $1000.00 and paid Taylor a total of $1500.00.

{¶10} Taylor provided Durham account information for six additional PNC accounts.  Durham and McClanahan used the account information to withdraw thousands

at several branches of PNC in Columbus, Cincinnati and Cleveland, but did not return to Taylor's branch. Durham and McClanahan also traveled to Florida and made an unsuccessful attempt to withdraw funds from a PNC branch at Fort Lauderdale.

{¶11} The PNC Loss Prevention Department received reports of fraudulent withdrawals and took steps to protect customer accounts while attempting to track down the perpetrators. On July 10, 2017, Loss Prevention contacted Nichole Morris, a fraud investigator employed by PNC, and she began reviewing the nine suspicious transactions that had been identified. The bank had identified the relevant transfers and had video of the withdrawals but no information regarding the identity of the man withdrawing the funds. Morris reviewed the credentials that the man presented and confirmed that the driver's license number that he submitted matched the information in the bank files. Morris then compared that information with the records of the Ohio Bureau of Motor Vehicles and found a discrepancy. The number provided by the person who made the withdrawal differed from the BMV records by one number, but matched the information in PNC records, leading Morris to conclude that the culprit had a partner working for the bank who had access to the account information.

{¶12} PNC records revealed that Taylor was the employee that processed the first withdrawal, so Morris reviewed video of her actions and discovered suspicious activity. Taylor was seen holding her cell phone in such a way as to suggest she was photographing the screen. Also, during the first withdrawal with McClanahan, the video showed that both Taylor and McClanahan were active on their phones, but it appeared that neither said a word to the other. This evidence led Morris to suspect that Taylor was the person inside PNC providing account details used in the fraud and she decided to

confront Taylor. She contacted Detective Ted Smith of the Westerville Police Department, relayed her findings and asked him to be present to question Taylor after her interview.

{¶13} Taylor appeared for work on July 21, 2017 and was immediately taken to a room in basement of the bank where Morris confronted her about her suspicions. Taylor admitted to compromising one account but neglected to mention the remaining six accounts she had delivered to Durham. She identified Willie Maxx as one of the people involved in the withdrawals, but she did not know McClanahan so she could not identify him. Morris asked for a written statement and, when that was completed, she invited Detective Smith into the room.

{¶14} Detective Smith began the interview by assuring Taylor that he did not believe she was the mastermind behind the scheme, and it appears this was partially true and partially an effort to put Taylor at ease and convince her to disclose what she knew about the plan and her confederates. After some initial reluctance to confess, Taylor admitted her role in providing account details on seven accounts. She claimed she did not know McClanahan, but named a third person, Willie Maxx, as the coordinator of the plan. She explained that she communicated with Maxx primarily via text message. Detective Smith obtained her consent to view the contents of her phone and discovered hundreds of messages with Willie Maxx. Detective Smith and another detective scrolled through and photographed all of the text messages.

{¶15} Detective Smith persuaded Taylor to cooperate with the Westerville Police Department by continuing to communicate with Willie Maxx over the phone. She agreed and he returned the phone at the conclusion of the interview. Taylor did continue her

communications with Willie Maxx, but refused to provide him additional account information.

**{¶16}** Taylor explained to Detective Smith that she and Willie Maxx communicated through Facebook before she had his phone number. Detective Smith located Willie Maxx's Facebook page and discovered that Willie Maxx was William Durham, Jr.. While reviewing the content of Durham's Facebook page, he found a photograph of a person who resembled the suspect in the bank videos who completed the withdrawals. Detective Smith opened that person's Facebook page, discovered the name William Marquis McClanahan, and later discovered that McClanahan was Durham's cousin.

**{¶17}** Detective Smith's investigation was inactive for some time until he had the opportunity to interview McClanahan in a Franklin County Detention Center. Detective Smith began his interview in the same manner as with Taylor, telling McClanahan that he did not believe he was the mastermind. He also mentioned that he had information regarding the scheme and that he wanted to confirm that information. McClanahan disclosed his role in the plan as the bag man and described several withdrawals after the first with Taylor, totaling over $100,000.00. He confirmed that Willie Maxx was William Durham, Jr..

**{¶18}** The state did not offer Taylor or McClanahan any incentive to provide a statement or testify, though the detective did tell both that he would report their cooperation to the prosecutor and that it could have a positive effect.

**{¶19}** Durham was arrested and charged with seven offenses all arising from the planning and completion of the fraudulent withdrawals from PNC. Taylor and McClanahan testified at the trial admitting their role in the crimes and describing Durham's

participation.   Nichole Morris and Detective Smith described their investigation and interviews of Taylor and McClanahan. Brook Segaard provided testimony regarding cell phone data to show that the cell phone number attributed to Durham by Taylor and McClanahan was used in Columbus, Cleveland and Cincinnati at times that matched the times McClanahan and Durham were in those cities planning or completing fraudulent withdrawals.  Durham's attorneys cross-examined each witness and, at the conclusion of the state's case, moved for acquittal. That motion was denied and the case was submitted to the jury who returned a guilty verdict on six of the seven counts.  Appellant filed an appeal and submitted two assignments of error:

{¶20} I.  THE APPELLANT WAS DENIED A FAIR TRIAL IN ACCORDANCE WITH THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND THE DUE PROCESS CLAUSE AS INCORPORATED BY AND THROUGH THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION ON ACCOUNT OF PROSECUTORIAL MISCONDUCT BECAUSE SAID MISCONDUCT WAS PRONOUNCED AND PERSISTENT, UNFAIRLY PREJUDICIAL, AND AFFECTED THE APPELLANT'S SUBSTANTIAL RIGHTS."

{¶21} "II. THE APPELLANT'S CONVICTIONS AS TO ALL COUNTS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

### PROSECUTORIAL MISCONDUCT

{¶22} Durham complains that he was denied a fair trial as a result of pronounced, persistent and unfairly prejudicial prosecutorial misconduct that affected his substantial rights. Durham describes several instances of purported misconduct in his brief, but he made no objection to the prosecutor's actions when they occurred.  Because there was

no objection to the alleged instances of prosecutorial misconduct, the alleged improprieties are waived, absent plain error. *State v. White*, 82 Ohio St.3d 16, 22, 1998–Ohio–363, 693 N.E.2d 772 (1998), quoting *State v. Slagle*, 65 Ohio St.3d 597, 604, 605 N.E.2d 916 (1992).

**{¶23}** "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim. R. 52.　The rule places several limitations on a reviewing court's determination to correct an error despite the absence of timely objection at trial: (1) "there must be an error, i.e., a deviation from a legal rule," (2) "the error must be plain," that is, an error that constitutes "an 'obvious' defect in the trial proceedings," and (3) the error must have affected "substantial rights" such that "the trial court's error must have affected the outcome of the trial." *State v. Dunn*, 5th Dist. Stark No. 2008–CA–00137, 2009–Ohio–1688, quoting *State v. Morales*, 10 Dist. Franklin Nos. 03–AP–318, 03–AP–319, 2004–Ohio–3391, at ¶ 19. The decision to correct a plain error is discretionary and should be made "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

**{¶24}** In the context of proving the existence of plain error, Durham must fulfill the requirements of the Supreme Court of Ohio described in *State v. Brinkley,* 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 135 (2005) to prove prosecutorial misconduct. Durham must show that "(1) *** the remarks were improper, and if so, (2) *** the remarks prejudicially affected an accused's substantial rights.　*** The touchstone of [the] analysis "is the fairness of the trial, not the culpability of the prosecutor."

**{¶25}** We find Durham's allegations of prosecutorial misconduct to be based on strained interpretations of excerpts from the trial transcript, presented without relevant context and ascribed unwarranted unscrupulous intent. When we view the words of the prosecutor in the context of the trial, we find no support for Durham's allegations.

## DESCRIPTION OF TAYLOR

**{¶26}** Durham contends that the prosecutor inappropriately portrayed Taylor as a desperate single mother who fell victim to a scheme not of her own creation in a bid to create sympathy and bolster Taylors credibility. Upon review of the record, we find that the prosecutor's comments were consistent with the facts presented at the trial and that Durham's characterization of the comments are his interpretation of the statements. The prosecutor did not expressly characterize Taylor as "desperate," a "pawn," or a "victim" but instead described the facts from which the jury may draw its own conclusions regarding Taylor's culpability and credibility.

## VOUCHING FOR WITNESSES

**{¶27}** Durham contends the prosecutor vouched for the credibility of Taylor and McClanahan when he told the jury that he did not make any promises to them in exchange for their testimony. Durham must show that the prosecutor implied knowledge of facts outside the record or placed his personal credibility in issue to show that the prosecutor vouched for the witness. *State v. Keene*, 81 Ohio St.3d 646, 666, 693 N.E.2d 246 (1998) as quoted in *State v. Jackson,* 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 117. We find that the prosecutor did neither in this case.

**{¶28}** Durham's trial counsel aggressively attacked the credibility of Taylor and McClanhan and made it a focal point of the defense. He contended that the witnesses'

testimony was tainted by their desire to receive favorable treatment in exchange for damning testimony against Durham. The prosecutor's comments did not imply knowledge of fact outside the record nor did it place his credibility at issue, but instead directly responded to Durham's assertion that Taylor and McClanahan's testimony was the result of a quid pro quo.

**{¶29}** We reach the same result when we review Durham's argument regarding the prosecutor's comment during opening statements.  Durham complains that "the prosecutor stated Taylor was "telling the truth" because "she [handed] over a load of text messages [to Detective Smith on July 21, 2017 during Taylor's initial interview]" but his statement is not an accurate description of the prosecutor's comments. When describing Taylor's conversation with Detective Smith, the prosecutor stated "Briana Taylor says she's been talking to this guy she knows as Willie Maxx.  She's known him for a while. And she relates the story that I just gave to you, and she gives over to the police a load of text messages to show that she's telling the truth."  The prosecutor described an event and the motivation of Taylor without placing his own credibility at issue or implying knowledge of facts outside the record.

### KNOWLEDGE OF WILLIAM DURHAM'S PARTICIPATOIN

**{¶30}** Durham complains that the prosecutor improperly stated during both the opening statement and closing argument that PNC knew that he was involved with the scheme after their initial interview with Taylor, but the record does not support his characterization of the prosecutor's statement.  Taylor identified Willie Maxx as the person that received the account information and fraudulent data and the testimony and evidence presented at trial included material proof that Willie Maxx was Durham's alias, including

the in court identification of Durham by Taylor and McClanahan.  The prosecutor did not state, as Durham contends, "that PNC knew William Durham was involved with the fraudulent scheme after conducting their initial interview with Taylor" but did state that "Because they didn't know who William McClanahan was at the time. All they knew was that William Durham, who goes by Willie Maxx, was talking to Briana Taylor." Durham has interpreted the prosecutor's comments to support a conclusion that is unwarranted by the text of the record and the context of the comments.

### QUESTIONING OF BRIANA TAYLOR

**{¶31}** Durham  is critical of the prosecutors questioning of Taylor.  He contends the prosecutor  asked Taylor leading questions and that his reading of text messages between Taylor and Durham improperly made the prosecutor a witness and bolstered the value of the evidence.  He argues that the prosecutor inappropriately cued her to change her testimony and   "takes issue" with the manner in which the prosecutor framed a particularly important question to Taylor on redirect examination. We have considered the record of the trial and conclude that it is not clear that any of the cited pages contain actions which are objectionable and we find that none rise to the level of misconduct.

**{¶32}** Durham's complaint suggests that the prosecutor and Taylor engaged in a lengthy and uninterrupted reading of the text messages, but the record does not support that conclusion. The prosecutor read text messages as a preamble to a question to Taylor, generally requesting an interpretation of the words and phrases used in the texts as they were often not clear, or to question Taylor regarding events related to the comments. Durham concludes that the act of the prosecutor reading the text message prior to asking a question somehow heightened the value of the evidence, but neglects

to provide any argument in support of that conclusion other than to suggest that the reading bolsters the contested evidence in the eyes of the jury because the prosecutor is asserting personal knowledge. We find nothing in the record that provides support for a conclusion that the act of reading a text message has any appreciable impact on the jury's perception of the weight or credibility of the message or that it implies that the prosecutor is asserting personal knowledge of any fact.

{¶33} Durham next concocts a theory that the prosecutor asked Taylor an inappropriate question during re-direct examination because Taylor admitted lying during cross examination. He references the following question in the cross examination in support of his argument:

Q. You actually admitted that to the police; right?

A. Yes.

{¶34} In isolation this exchange has no meaning, so we assume that Durham is referring to the immediately preceding question where Taylor admitted deleting text messages "from prior to July." Durham "takes issue" with the manner in which the prosecutor framed a question on re-direct that he interprets as responding to this question, but any connection is tenuous at best and suffers from lack of context. Durham cites to lines 7 through 12 of the transcript on page 554, disregarding the context provided by the preceding six lines. The full exchange, including lines 1 through 6 is:

Q. Okay. Your testimony here today was that, to the PNC investigators, you

lied and said there was only one account --

A.      Yes.

Q. -- that was compromised?

A.    Correct.

Q. But then when the police interviewed you, did you give them the whole

story at that point?

A.    Yes.

Q. Okay. And was that only a few minutes later?

A.    Yes.

**{¶35}** We find that the prosecutor comments were directed toward Taylor's misrepresentation to the bank investigators regarding the number of accounts compromised and her disclosure of the correct number to Detective Smith.  While during his testimony Detective Smith acknowledged that Taylor lied to him initially,  he learned that she lied during the interview when she subsequently provided truthful information during that same interview.  And while Taylor did lie to the PNC fraud investigator and the police, Durham's allegation that the prosecutor acted inappropriately is vague and not supported by the record.

### MCCLANAHAN'S TRIP TO FLORIDA

**{¶36}**  Durham's allegation that the prosecutor put words into McClanahan's mouth cites portions of the record, strips them of their context and imposes an unwarranted devious intent.  The questions and responses leading to the transcript excerpt cited by Durham make it clear that both he and McClanahan travelled to Florida.  Placed in context, the testimony supports a conclusion that McClanahan and Durham traveled together to Florida and the prosecutor's question was designed to clarify the record. Durham's assertion that McClanahan testified that he alone went to Florida to carry out

fraudulent transactions is, at best, a strained interpretation of the testimony, which provides no support to an assertion of prosecutorial misconduct.

**{¶37}** We have reviewed the record and find no support for Durham's allegations of prosecutorial misconduct. Durham removes excerpts of the transcript from their context and assigns those excerpts devious and unfair motivation to support his conclusion that the prosecutor committed acts that were so inappropriate as to rob him of a fair trial. When the same excerpts are viewed in the context from which they were taken, the alleged misconduct vanishes and what remains are prosecutorial actions that might prompt an objection, but were not so egregious as to warrant a conclusion that Durham was the victim of prosecutorial misconduct.

**{¶38}** Because we have found no evidence of prosecutorial misconduct it follows that the trial court did not commit plain error.

**{¶39}** Appellant's first assignment of error is overruled.

II.

**{¶40}** Durham contends that his conviction was against the manifest weight of the evidence, focusing upon the credibility of Briana Taylor and William McClanahan.

In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." ***. Reversing a conviction as being

against the manifest weight of the evidence and ordering a new trial should

be reserved for only the "exceptional case in which the evidence weighs

heavily against the conviction.

*State v. Schoeneman*, 5th Dist. Stark No. 2017CA00049, 2017-Ohio-7472, ¶¶ 21-23.

**{¶41}** Durham's argument that his conviction was against the manifest weight of

the evidence relies upon a finding that Taylor and McClanahan's testimony must be

disregarded as entirely incredible, but his argument lacks authority that would allow this

court to rely on our view of the credibility of the witnesses alone. Further, he has neglected

to address how Taylor and McClanahan presented arguably consistent stories when the

record lacks any evidence that they met aside for the first fraudulent withdrawal where

they apparently did not exchange a word. Durham would have us conclude that Taylor

and McClanahan coincidentally both chose him as a scapegoat, an assertion that is not

supported by the record.

**{¶42}** "A fundamental premise of our criminal trial system is that 'the jury is the lie

detector.' *United States v. Barnard*, 490 F.2d 907, 912 (C.A.9 1973) cert. denied, 416

U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). Determining the weight and credibility of

witness testimony, therefore, has long been held to be the 'part of every case [that]

belongs to the jury, who are presumed to be fitted for it by their natural intelligence and

their practical knowledge of men and the ways of men.' *Aetna Life Ins. Co. v. Ward*, 140

U.S. 76, 88, 11 S.Ct. 720, 724–725, 35 L.Ed. 371 (1891)". *United States v. Scheffer*

(1997), 523 U.S. 303, 313, 118 S.Ct. 1261, 1266–1267, 140 L.Ed.2d 413.

**{¶43}** In the instant case, the jury was free to accept or reject any and all of the

evidence offered by the parties and assess the witness's credibility. "While the jury may

take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence". *State v. Craig* (Mar. 23, 2000), Franklin App. No. 99AP739, quoting *State v. Nivens* (May 28, 1996), Franklin App. No. 95APA09–1236. Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Antill* (1964), 176 Ohio St. 61, 67, 197 N.E.2d 548; *State v. Caldwell* (1992), 79 Ohio App.3d 667, 607 N.E.2d 1096.

{¶44} After reviewing the evidence, we cannot say that this is one of the exceptional cases where the evidence weighs heavily against the convictions. The jury heard testimony from five witnesses and Durham describes issues with the witnesses' testimony, particularly Taylor and McClanahan's, that he asserts should lead us to reject the jury's finding regarding their credibility and its verdict. After review of the record, we disagree with Durham's conclusion regarding the evidence and reject his invitation to overturn the jury's verdict.

{¶45} The jury heard the witnesses, evaluated the evidence, and was convinced of appellant's guilt. Durham's counsel highlighted the issues of credibility and inconsistencies during cross-examination and closing argument. The jury in this case chose to believe the version of events presented by the appellee's witnesses. The jury did not lose its way in arriving at a conviction and find no reason to disturb the jury's conclusion.

{¶46} The appellant's second assignment of error is overruled.

**{¶47}** The decision of the Delaware County Court of Common Pleas is affirmed.

By: Baldwin, J.

Gwin, P.J. and

Wise, John, J. concur.